# THE REAL ESTATE TRUST COMPANY *vs.* J. EDWARD BIRD.

*Corporations—Right to Subscribe to New Shares of Stock—Rights of Assignee of Stock Certificate—Waiver of Right of Subscription—Damages for Refusal to Allot New Shares.*

A bill in equity lies to compel a corporation to transfer on its books shares of stock to a purchaser of the same and to issue a certificate therefor.

When the capital stock of a corporation is increased by the issue of new shares, the general rule is that the holders of the original stock are entitled to the new stock in the proportion that the number of shares held by them bears to the whole number before the increase.

If the holder of shares of stock waives to the corporation his right to subscribe to new shares, the issue of which may be thereafter authorized, and subsequently transfers his shares to a person who has no notice of such waiver, the transferee is not affected by the waiver and is entitled to subscribe to the new shares, the issue of which is authorized when he is the holder of the original shares.

A person who subscribed to fifty shares of the stock of a new corporation received a certificate stating that he had paid a certain sum thereon, and that upon payment of the balance as called, a full-paid certificate of stock would be issued upon surrender of that certificate. The charter of the company provided for an increase of the capital stock by a vote at a stockholders' meeting, and directed that the stockholders at the time of such increase should be entitled to a *pro rata* share of the same. The subscriber to said fifty shares, signed a paper waiving his right to take any additional shares and afterwards sold his certificate to the plaintiff, who purchased the same without any notice of the waiver. Subsequently, the stockholders formally voted to increase the capital stock. The corporation refused to transfer the fifty shares to plaintiff or to allot to him any of the increased stock, and he filed a bill in equity asking that the defendant be required to transfer to him the fifty shares of stock and to accept his subscription for his proportion of the new stock, or if that relief could not be granted, that the defendant might be decreed to pay him such damages as he had suffered. *Held,*

1st. That the plaintiff is entitled to have the fifty shares transferred to him on the books of the company as of the date of his first demand therefor.

2nd. That the person entitled to subscribe to the increased stock is not the original subscriber, but the holder of the original stock at the

time the increase is legally authorized, the right to the increase being an incident to the ownership of the stock, and that since plaintiff was such holder at the time the stockholders directed the issue of the new stock, he was entitled to subscribe for his share of the same.

3rd. That the plaintiff as *bona fide* assignee of the original fifty shares is not affected by the waiver of the right to subscribe to the new stock made by his assignor, of which waiver he had no notice, and when the certificate issued by the corporation after such waiver, made no mention of the same.

4th. That since the corporation had issued all of the authorized in-increased stock to other persons the plaintiff is entitled to recover damages.

Appeal from a decree of the Circuit Court No. 2, of Baltimore City (STOCKBRIDGE, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, BOYD, PEARCE and SCHMUCKER, JJ.

*Edgar H. Gans* and *Chas. Morris Howard* for the appellant.

The appellant will contend: 1. That Brooks, the original subscriber to the 50 shares of stock, effectually waived all right to the *pro rata* increase which those 50 shares would otherwise be entitled to. 2. That Bird, the appellee, acquired the stock subject to this waiver, and took no greater rights to the increased stock than Brooks would be entitled to had he continued owner of the stock.

I. Why is it that an original subscriber is entitled, as of right, to the preferential option of subscribing to increased stock? When a number of persons form a corporation with a fixed number of shares, it is evident that, looking at the corporation as a peculiar form of partnership, or as a managing body acting as trustee for *cestuis que trustent*, that because of a limitation of the capital to be employed, there is no power to create another interest for persons other than those concerned in the original trust, or for the benefit even of those originally interested, in any other proportions than those determined by their subsisting shares except with their consent. "A share in the stock or trust

\* \* \* is a share in the power of increasing it \* \* \* when the *cestuis que trustent* agree." To illustrate: A corporation is organized with a capital of $1,000, in which A owns one-half the stock. It does business for awhile and makes money, which it invests in property, the result being that its assets, free from debt, are worth $2,000. If it were liquidated then, A's interest would be $1,000. Instead of liquidating, it is proposed to increase the stock, and get subscribers for $1,000 more of stock. B, a stranger to the corporation, desires to subscribe to the new issue. Why should he not be allowed to do so ? Simply because if he did, and paid the money, he would have one-half interest in the assets. The assets would be $3,000, and he would get $1,500 for his $1,000 subscription, while A, who was entitled to one-half the original assets, and therefore to $1,500, counting the new subscription, would get only one-fourth of $3,000 or $750. In other words, the original subscribers have a right to the assets in *the proportion* which their subscription bears to the whole stock, and this right of *definite proportion*, whether one-half or one-fourth, or whatever it may be, cannot be changed without their consent. If A starts into an enterprise owning one-third of the stock, there is no right, against his consent, to so increase the stock that he will own only one-fourth or one-sixth.

This right of preferential option, therefore, exists from the very time of the subscription. It is true it cannot be actually realized until the increase is declared. But the declaration of increase does not *give the right*, it is only the occasion which calls the pre-existing right into action. It is like the inchoate right of dower. A wife has no dower-right until her husband dies. Just as a stockholder has no right to increased stock, unless the increase is declared. If she dies before her husband, the right is never realized. So the stockholder's right is not realized unless the increase is authorized. But who would contend that a wife may not bar or waive dower by her acts antecedent to the death

of her husband ?  And so are the authorities.  The right of the original subscriber to increase his interest in the stock whenever the company shall agree upon it, is a part of the benefit attached to his original subscription.  *Gray* v. *Portland Bank*, 3 Mass. 378–9 ; *Eidman* v. *Bowman*, 58 Ill. 447–8 ; *Jones* v. *Morrison*, 31 Minn. 153.

There is no doubt that all the original stockholders so understood their rights, for in the agreement of waiver they say :  "We, the undersigned, being subscribers to the original stock of the Real Estate Trust Co., *and having the right under the charter* to subscribe *pro rata* to the proposed increase of 8,000 shares."

Moreover, this right is *severable* from the stock on which it is founded ; it is not inseparably bound up with the stock.  This is manifest upon simple reflection.  The right is only a preferential option.  The new stock must be offered to the old subscribers, but they may take it or refuse it as they like ; and when they refuse, the corporation may offer it to anyone they like.  Being a severable right, it may be waived by A, and yet A will continue to be full owner of his shares.  It may not only be waived, but may be sold independently of the stock.  *Jones* v. *Concord*, 30 Atl. Rep. 614–617 ; *Biddle's Appeal*, 99 Pa. St. 278 ; *Wilbank's Appeal*, 64 Pa. St. 256 ; *Eidman* v. *Bowman*, 58 Ill. 444 ; *Jones* v. *Morrison*, 31 Minn. 153.

This right to participate *pro rata* in future increase of stock, being a severable, incidental right, capable of being sold or waived, by one who nevertheless continues to be owner of the original stock, it is clear upon the proof that it was waived by Brooks, that he did not have it as against the corporation when he sold his stock to Bird, and that if he had continued to hold the stock until the authorized declaration of increase he would have had no right to any part of the increased stock.

II. *Bird Acquired Stock Subject to Waiver*.  The Court below treated this stock as negotiable, and therefore, even if Brooks had lost his rights to the increased stock by

waiver, yet, because Bird did not know of the waiver, it would constitute but a latent equity from which a *bona fide* assignee for value would be free.   We respectfully dissent from this view and contend that stock is not negotiable, and that there is no estoppel as to the kind of equity here disclosed.

If there is a principle fully established in modern law it is that stock in a corporation is not negotiable.   Every case which seems to indicate a contrary opinion is based not on negotiability, but on estoppel.   Even the case cited by the Court below, *Knox* v. *Eden Musee*, 148 N. Y. 456, decides that title to stock stolen will not pass to the purchaser from the thief.   It is true that if the secretary of a corporation illegally issues stock signed in blank by the president and treasurer, or even if he forges the name of the president, the corporation will be bound ; or when one delivers stock to another, or allows him to have it in his possession and the latter sells it, in fraud of the owner, the corporation will be bound ; this results not from the negotiable quality of the stock but from the ordinary principles of estoppel *in pais*.   *Tome* v. *Parkersburg*, 39 Md. 36 ; *Western Md. R. R.* v. *Franklin Bank*, 60 Md. 36 ; *N. Y.* v. *Schuyler*, 34 N. Y. 30.

Stock is not negotiable.   " Repeated efforts have been made to have certificates of stock declared negotiable paper, but they have been unsuccessful.   Such certificate is not negotiable either in form or character ; and, like every non-negotiable paper, whoever takes it does so *subject to its equities and burdens;* and though ignorant of such equities and burdens, *his ignorance does not relieve the paper therefrom*, or enable him to hold it discharged therefrom." *Hammond* v. *Hastings*, 134 U. S. 401.

The precise question was argued by counsel in case of *Reese* v. *Bank of Commerce*, 14 Md. 271, where they say that *bona fide* holder for value is not bound by secret extrinsic equities.   But the Court declared, as to stock, that the assignee took subject to the rights of the assignor, of

which he was bound to take notice.   See *Farmer's Bank* v. *Iglehart*, 6 Gill, 56–7 ; *Railroad Company* v. *Howard*, 7 Wall. 415 ; *Shaw v. Spencer*, 100 Mass. 382 ; 1 *Cook Corp.*, sec. 412.   " As a rule, the purchaser of stock in a corporation acquires no other or better title than the seller or assignor had, and takes it subject to the equitable and legal rights of third persons."   *Weaver* v. *Barden*, 49 N. Y. 288–9.

The case at bar is illustrated exactly by the case of *Hammond* v. *Hastings*, 134 U. S. 401, 405.   There a corporation had a lien upon the shares of a stockholder for an unpaid debt, and the lien was enforced, as also in the *Maryland cases*, against a *bona fide* assignor of the stock.   There the charter provided that there should be a lien for an unpaid debt, in other words, established the rule, of which the assignee was bound to take notice.   Here the law of waiver as to new stock is common law, of which the assignee is bound to take notice.   There the actual indebtedness of the stockholder, assignor, was not known to the assignee, and he could not find it out except from the assignor or the corporation.   Here the actual waiver was not known to the assignee, and he could not find it out except by applying to the assignor or the corporation.   In both cases the right which affected the assignee was a right collateral and incidental to the stock.   If the assignee is bound by the latent equity in one case, why not in the other ?   Again, it was held in those cases that the corporation could waive its lien for the benefit of the assignor ; why in our case cannot the assignor waive his right for the benefit of the corporation ?

*Finally*. There is no equity in appellee's claim.   He did not pay for the stock more than its market value.   No representations were made to him as to its incidental rights. He did not even know of the charter provision giving the right to the increased stock.   He had no knowledge of the proposed increase at the time he bought.

*M. R. Walter*, for the appellee.

I. Bird was entitled to have had the stock transferred to him by the company when he requested it.

(*a.*) The certificate, which was in the usual form, recited that Brooks was entitled to fifty shares of the capital stock, and that it was transferable on the books of the company, and on the back of the certificate when issued to Brooks was a printed assignment in the usual form, with a power of attorney. This assignment was duly executed by Brooks and the certificate and assignment delivered to Bird. The common mode of assignment is the execution of an instrument of transfer, coupled with a blank power of attorney and signed by the owner of the stock. *Knox* v. *Eden Musee*, 148 N. Y. 424; *Johnston* v. *Laflin*, 103 U. S. 804; 23 *American and English Ency.*, pages 649–650; 1 *Cook on Corporations*, sections 375, 380, pages 735, 739; *McNiel* v. *Tenth National Bank*, 46 N. Y. 341. And the blank may be filled by any *bona fide* holder, and such insertion when made causes the transfer to relate back to the date of the assignment. *Prall* v. *Tilt*, 28 N. J. Eq. 483; 23 *Am. & Eng. Ency.*, page 650; *Holbrook* v. *N. J. Zinc Co.*, 57 N Y. 623. Such a delivery transfers the absolute equitable title to the shares as between the parties to the transfer. *Balto. City P. R. W. Co.* v. *Sewell*, 35 Md. 253; *Kerr* v. *Urie*, 86 Md. 76, 77; *Knox* v. *Eden Musee*, 148 N. Y. 454; *Johnston* v. *Laflin*, 103 U. S. 804; *McLean* v. *The Charles Wright Medicine Co.*, 96 Mich. 479; *Swift* v. *Smith*, 65 Md. 428; *Bloede* v. *Bloede*, 84 Md. 141; *Noble* v. *Turner*, 69 Md. 524.

(*b.*) " It cannot now be denied that if a corporation, having power to issue stock certificates, does in fact issue such a certificate, in which it affirms that a designated person is entitled to a certain number of shares of stock, it thereby holds out to persons who may deal in good faith with the person named in the certificate that *he is the owner and has capacity to transfer the shares.* This view does not rest on any view of the negotiability of stock, but on general principles pertaining to the law of estoppel." "When the defendant issued its certificate   *   *   *   it affirmed to all persons who might deal with him that he owned a certain por-

tion of its capital stock and had full power to transfer it. Any purchaser had a right to rely upon this statement and to claim the benefit of an estoppel in his favor." "The certificate itself must be regarded as a continuing affirmation of the ownership of * * * and his power over the stock until it is withdrawn in some manner designated by law." *Holbrook* v. *N. J. Zinc Co.*, 57 N. Y. 621 ; *C. N. O. & T. P. Ry. Co.* v. *Nat. Bank*, 56 Ohio St. 351 ; *Bank of Holly Springs* v. *Pinson*, 58 Miss. 438 ; *Lanier* v. *Bank*, 11 Wall. 377.

(*c.*) The provision that the stock was "transferable only on the books of the company" does not in anywise affect the appellee's title to the stock or his right to compel the company to transfer it. *Bloede Co.* v. *Bloede*, 84 Md. 142 ; *Masury* v. *Ark. Nat. Bank*, 93 Fed. Rep. 603 ; *Sewell's case*, 35 Md. 253 ; *Bank* v. *Pinson*, 58 Miss. 437 ; *Driscoll* v. *West Bradley*, 59 N. Y. 96.

(*d.*) The fact that the stock had not been fully paid up did not affect the appellee's right to have the transfer made to him by the company. 1st. The certificate was by the appellant declared on its face to be transferable and the form of assignment printed on its back at the time of its issue. 2nd. But even had that declaration not been on the certificate, the appellee would have been entitled to the transfer by the company.

Unless the charter otherwise provides, a subscriber, to whom a regular certificate has been issued, is a *bona fide* shareholder, entitled to transfer his stock, although he may have paid nothing. 2 *Thompson on Corporations*, sec. 1692; *Downin* v. *Potts*, 23 N. J. L. 66 ; 1 *Cook on Corp.*, sec. 255. p. 494. A certificate is not even necessary to the complete ownership of stock, nor is payment of subscription necessary thereto. 1 *Cook on Corporations*, section 13. "In the absence of special provisions to the contrary, either in the statute under which the corporation is organized or in its by-laws, an original subscriber to the stock of such corporation can transfer his stock to another, and if made in

good faith his liability as a stockholder ceases, and the transferee will be substituted in his place, with the same rights and liabilities as the original holder." *Rochester and K. F. Land Co.* v. *Raymond,* 158 N. Y. 576, 583 ; *Hall* v. *Insurance Co.,* 5 Gill, 484. " Instalments upon subscriptions of stock not called for are not within the clause of charters, declaring that stock shall not be transferred by a stockholder until debts due the company by him are paid or secured." *Hall* v. *Ins. Co.,* 5 Gill, 484.

II. *For the purposes of this case Bird was the legal owner of Brooks' shares when the capital stock was increased, and therefore, entitled to his pro rata of the latter.* The assignment and delivery of the certificate for the fifty shares having entitled Bird to have the stock transferred to him on the books of the company, the company cannot be heard to set up its own tortious refusal to transfer as a bar to his assertion of his rights. The transfer will be considered complete, and the company is bound to recognize it precisely as if the entries had been made upon the company's books. For the purposes of this case Bird became the *legal* owner of the shares upon the company's refusal to transfer. *Ernst* v. *Elmira Municipal Imp. Co.,* 54 N. Y. Supp. 116 ; *Whitney* v. *Butler,* 118 U. S. 662. "The assignee need only make his right known to the company and require the transfer to be entered on its books and his title becomes perfect." *B. C. P. Rwy. Co.* v. *Sewell,* 35 Md. 252.

Having made the demand prior to the meeting of stockholders, at which the capital stock of the company was increased, and being then to all intents and purposes a stockholder at that time, he was entitled under the provisions of the company's charter to his *pro rata* share of the increase. For the exercise of this right he was entitled to notice of the action of the company, and to a fixed or reasonable time within which to signify his exercise or waiver of that right. 1 *Cook on Corporations,* secs 286, 70 ; *Morris* v. *Stevens,* 178 Penna. St. 563. He received no notice whatever of its action, although he insisted on his right to his *pro rata* prior

to the meeting of January 20. The notices to all the allottees were sent out on Saturday, January 21, 1899. On Tuesday, the 24th, the appellee offered to subscribe for his *pro rata*, and was refused. On Wednesday, the 25th, he presented his formal subscription in writing with a legal tender of the 50 per cent called for, which were refused. He thus did everything that could possibly be required of him to entitle him to his *pro rata* of the increase.

III. Being a *bona fide* holder for value and without notice, actual or constructive, Bird could not be affected by Brooks' agreement to waive his right to subscribe to a *pro rata* of the proposed increase of the capital stock of the company. (*a.*) That agreement was signed on or about November 1, 1898. One month thereafter, Brooks paid the fifty per cent call and received from the company the certificate of stock, which certified that he was " entitled to fifty shares," and that the certificate was transferable on the company's books—the blank form of assignment being printed on the back. It was an unqualified declaration by the company that Brooks was entitled to fifty shares of stock, and had the right to transfer it. There was not only no mention of Brooks' agreement, but nothing on the face of the certificate to put Bird upon inquiry. The appellant having held Brooks out as the absolute and unqualified owner, is estopped from setting up the waiver as against Bird. *Holbrook* v. *N. J. Zinc Co.*, 57 N. Y. 611 ; *C. N. O. & T. P. Ry. Co.* v. *Citizens' Nat. Bank*, 56 Ohio St. 351 ; 1 *Cook on Corporations*, section 416, pages 776, 777 ; 2 *Thompson on Corporations*, sections 2599, 2595 ; *Bank of Holly Springs* v. *Pinson*, 58 Miss. 437 ; *Western Md. R. R. Co.* v. *Franklin Bank*, 60 Md. 46. The certificate of stock is a continuing affirmation by the corporation of the shareholder's title. 2 *Thompson on Corporations*, sections 2350, 2595 ; *Holbrook* v. *N. J. Zinc Co.*, 57 N. Y. 621. A purchaser is not bound to look beyond the face of the certificate. 2 *Thompson on Corporations*, section 2599 ; *Bank* v. *Pinson*, 58 Miss. 437.

(*b*). But independently of the principles of the law of

estoppel, Bird took a good title free from all equities by reason
of the quasi-negotiability of such certificates of stock.
*Grafflin* v. *Woodside*, 87 Md. 152; *Knox* v. *Eden Musee*, 148
N. Y. 454; *Brandt* v. *Ehlen*, 59 Md. 25, 26; *Anglo-
American Bank* v. *Granger's Bank*, 63 Cal. 359, 364; *Mc-
Niell* v. *Bank*, 46 N. Y. 333; 2 *Thompson on Corporations*,
sec. 2599, page 1894; *Prall* v. *Tilt*, 28 N. J. Eq. 483;
*Driscoll* v. *West Bradley*, 59 N. Y. 96.

(*c.*) Neither at the time of Brooks' supposed waiver,
November 1, 1898, nor at the date of the sale to Bird, De-
cember 10, 1898, had the stock been increased, nor had the
company taken any action in reference to an increase. The
call for the stockholders' meeting to consider the question
was not authorized until the directors' meeting of December
20, 1898, ten days after the title to the stock had been
vested in Bird. Prior to the meeting of January 20, 1899,
there was nothing for Brooks to waive—there could be no
valid subscription for, nor a valid waiver of any increase.

IV. Equity has jurisdiction to compel the appellant to
assign the stock to Bird and as of the date on which the
demand upon the company for its transfer was made by
him. A bill in equity is the usual and most appropriate
remedy. *Balto. City Pass. Ry. Co.* v. *Sewell*, 35 Md. 252,
253; *Kerr* v. *Urie*, 86 Md. 77; *Swift* v. *Smith*, 65 Md. 436;
*Ernst.* v. *Elmira Mun. Imp. Co.*, 54 N. Y. Supp. 116;
*Thompson on Corporations;* secs. 2393 and 2425; 1 *Cook on
Corp.*, sec. 384, p. 747; sec. 13, p. 47; *Johnston* v. *Laflin*,
103 U. S. 804; *Telegraph Co.* v. *Davenport*, 97 U. S. 371.

V. As the entire increased stock had been issued by the
company before the hearing, and the 100 shares to which Bird
was entitled could not, therefore, be isssued to him by the
company without a violation of its charter, Bird was entitled
to, and the Circuit Court properly decreed him, compensa-
tion in damages for the loss he suffered by the company's
refusal to give him his *pro rata* of the increase. The
prayer of relief was properly in the alternative—for specific
performance or compensation in damages. Jurisdiction of

the Circuit Court having attached in a case perfectly within its power, it properly maintained the jurisdiction to the end. *In re Reading Iron Works*, 149 Pa. 183 ; 1 *Cook on Corporations*, secs. 391, 61 ; *Telegraph Co.* v. *Davenport*, 97 U. S. 371 ; *State* v. *Carpenter*, 51 Ohio St. 89.

BOYD, J., delivered the opinion of the Court.

The appellant was incorporated by chapter 259 of the Acts of 1898, and by its charter was authorized to have a capital stock " of four thousand shares at fifty dollars each, being two hundred thousand dollars, with the privilege of increasing the same, from time to time, up to the sum of two million dollars, by a vote of the stockholders at a special meeting to be called for that purpose." The original stock of four thousand shares was subscribed for in full on or about November 1, 1898, by various parties, including fifty shares by W. B. Brooks, Jr. On the first day of December, following, a certificate was issued to Mr. Brooks for the fifty shares, in which it is stated that he had paid the sum of eighteen hundred and seventy-five dollars thereon, and that when the balance was paid, at such times and on such conditions as the board of directors should prescribe " a full-paid certificate of stock will be given upon surrender of this certificate." The above amount included fifty per cent, of the par value of the stock and a bonus, which was paid by all the subscribers—the stock being taken at seventy-five dollars per share. On December 10th the appellee purchased through a broker the stock of Mr. Brooks at a premium of thirteen · dollars per share.

On or about November 1, 1898, the subscribers signed, under seal, an agreement as follows : " We, the undersigned, being subscribers to the original stock of the Real Estate Trust Company, and having the right under the charter to subscribe *pro rata* to the proposed increase of. 8,000 shares, in accordance therewith, hereby agree to subscribe to the additional stock in the amounts set opposite our names, 50 per cent. of said subscription to be paid on

February 1st, 1899, and the balance when called for (after thirty days' notice), and we hereby waive our right to subscribe to any other portion of the remainder of said issue to which we would be entitled to subscribe, as shown below.

                    Subscriber.

No. shares taken.                    No. shares waived."

The number of shares of the proposed increase taken by Mr. Brooks was stated to be "none" and the number of shares waived "100." Neither the broker nor the appellee knew of the waiver when the latter purchased the stock. On January 20, 1899, the stockholders, in meeting assembled, after due notice, adopted a resolution increasing the stock from four thousand to twelve thousand shares, and the company having refused to transfer to the appellee the shares originally subscribed for by Mr. Brooks, or to allot to him any of the increased stock, he filed this bill, in which, amongst other relief asked for, he prays that the appellant be required to transfer to him on its books the fifty shares of stock, and to accept his subscription for one hundred shares of the new stock, or in the event that that relief could not be granted that the defendant might be decreed to pay him such damages as he has suffered by reason of its wrongful acts. The Court below passed a decree (1) requiring the defendant to transfer on its books, as of January 10, 1899, to the appellee, the fifty shares of its capital stock assigned to him by Mr. Brooks, and (2) allowing him damages for the defendant's refusal to accept the plaintiff's subscription for one hundred shares for the increased stock—it appearing that all of the eight thousand shares authorized by its stockholders had been allotted and issued by the company. From that decree this appeal was taken.

1. There is nothing on the certificate to indicate that it was not transferable. On the contrary, on its face is printed "Transferable only on the books of the company," and on the back of it there is printed assignment, such as is generally found on certificates of stock, which was filled up by

inserting the name of the appellee, the number of shares (fifty), and it was signed by Mr. Brooks—the name of the attorney to transfer the stock on the books of the company being left blank.    The assignment was dated December 10, 1898.    After the purchase by the appellee the broker seems to have made some effort to have the stock transferred on the books, but the evidence does not show that he saw the proper officer of the company, his messenger apparently having failed to find where the transfer-office was.    The appellee testified that his first visit to the office of the company was January 10, 1899, and he wrote a letter of that date in which he notified the company of his purchase and concluded by saying " as I am informed, that no transfer can be made on your books until stock be paid up, kindly notify me of second assessment on the same when it is called."    He said, in answer to question whether any request had been made by him on the defendant for the transfer of the certificate, " An implied request was made upon my first call at the office of the company at the time already mentioned, and I was informed that the stock could not be transferred," and that, between that time and January 20, 1899, he called with his attorney and made a request that the stock be transferred but was refused.    On January 20th he again wrote stating " I beg to herewith renew my application for a transfer to me on the books of your company of the certificate No. 25 in the name of W. B. Brooks, Jr.," and insisted upon his right to a *pro rata* share of any increase of the stock.    On January 25th he made a formal offer to pay for the new stock, but on the 21st day of that month the company had allotted all the shares which had been authorized, some to the original stockholders and the others to new subscribers.    There seem to have been no by-laws of the company regulating the transfer of stock—at least none were offered in evidence. A few days after this bill was filed the secretary of the company wrote to the appellee, stating that the executive committee had the day before determined to transfer certifi-

cates of stock on which the first fifty per cent had been paid, and offering to transfer these shares to him. The president of the company testified that the first *formal demand* for the transfer made on him was at fifteen minutes before twelve o'clock on January 20, 1899 (the time the stockholders' meeting was held), but we do not understand him to deny that the appellee had prior to that time requested the transfer, as he swore he did. No valid reason for refusing to make the transfer is given. Under such circumstances it was the duty of the company to transfer the stock and inasmuch as it had refused to do so the appellee was entitled to relief. In 1 *Cook on Stock and Stockholders,* sec. 389, it is said that the transferee of stock, which it is the duty of the corporation to transfer, may pursue one of three remedies. " He may apply to a Court of Law for a *mandamus* to the corporation to compel it to open its books and allow the registry ; or he may bring a suit in equity, praying that the corporation be decreed to allow the registry, or to pay him damages, if registry is impossible ; or he may sue the corporation at law for damages, on the ground that by its refusal it has been guilty of a conversion of his stock." In section 391 that author says that the preceding in equity is " the surest, most complete and the most just remedy," and it is fully recognized in this State. *Kerr* v. *Uric,* 86 Md. 77 ; *Baltimore Retort and Fire Brick Co.* v. *Mali,* 65 Md. 97 ; *Swift* v. *Smith, ibid,* 435. Indeed we do not understand the appellant to deny that the appellee was entitled to such relief after the demand of January 20th, but the evidence sufficiently shows a refusal, at least as early as January 10th, and hence we think the Court below was right in the part of the decree we have been considering.

2. As the appellee was a *bona fide* holder of the stock for value and was entitled to have the transfer on the books of the company prior to the meeting of the stockholders at which the increase of the stock was ordered, but was prevented by the refusal of the company to do so, we must

consider the remaining questions in the case as if there had been an actual transfer on the books, as the appellant cannot profit by its own wrongful act. There can be no doubt that the general rule is that when the capital stock of a corporation is increased by the issue of new shares, authorized by the charter, the holders of the original stock are entitled to the new stock in the proportion that the number of shares held by them bears to the whole number, before the increase. *Gray* v. *Portland Bank,* 3 Mass. 364 ; *Eidman* v. *Bowman,* 58 Ill. 444 ; 1 *Cook on Stocks, etc.,* sec. 286 ; *Angell and Ames on Corporations,* sec. 554 ; *Jones* v. *Morrison,* 31 Minn. 140 ; *Biddle's Appeal,* 99 Pa. 278 ; *Jones* v. *Concord and M.·R. R.,* 67 N. H. 234 ; (s. c., 30 Atl. Rep. 614).

But that right of the original stockholders may be qualified or regulated by the terms of the charter. For example, in *Ohio Insurance Company* v. *Nunnemacher,* 15 Ind. 294, where the charter of a company gave the directors power to make by-laws for the management and disposition of the stock and to increase the stock to an amount named, on such terms and conditions and in such manner as to them should seem best, it was held that the original stockholders did not have the exclusive right to the new stock, in case of an increase. In the charter of this company (sec. 2), it is provided "and should the capital stock be at any time increased, *the stockholders at the time of such increase* shall be entitled to a *pro rata* share of such increase, upon the payment of not less than the par value of the same." That provision is, in substance, just what the cases above referred to decided, for none of them go to the extent of holding that one who was an original stockholder was entitled to a proportion of the increased stock, notwithstanding he had disposed of his stock before such increase was made. The charter certainly did not mean to confer on the original subscribers the right to the increased stock, irrespective of the question whether they retained their stock, for it expressly said that " *the stockholders at the time of such increase* " shall

be entitled, etc.    Mr. Brooks' right to the new stock was, therefore, dependent upon his holding his original stock until the capital was increased.    When the agreement of November 1, 1898, was executed the directors had not even been elected and no payment had been made on account of the stock.    The charter provides that "the incorporators, or a majority of them, named in this Act, shall have power to open books for subscriptions at such times and places as they may deem expedient, and when said four thousand shares have been subscribed *and when fifty per cent thereon has been paid in*,the stockholders may elect twenty directors, or a less number of directors, not less than twelve, however,to serve until the ensuing annual election."    It was a condition precedent to the organization of the company, for the transaction of business, that the four thousand shares be subscribed and the fifty per cent be paid.    It cannot therefore be said that November 1, 1898, was "the time of such increase" of stock, as they were not then in condition to even take the preliminary steps to make the increase—to call the meeting of stockholders for that purpose.    The fifty per cent was paid on the four thousand shares on or about December 1, 1898, and not until the 20th of that month did the directors hold the meeting at which they decided to call the stockholders together.    The only way by which it could be increased under the charter was "by a vote of the stockholders at a special meeting to be called for that purpose," and that meeting was held at twelve o'clock on January 20, 1899.    That was, therefore, the "time of such increase," and the appellee was then a stockholder, and by the terms of the charter was entitled "to a *pro rata* share of such increase."

But it is said, on the part of the appellant, that an original subscriber has the *right* to the proposed increase from the time of his subscription, and the act of the stockholders informally determining upon the increase only brings the *pre-existing right* into action.    We can only adopt that view in a qualified sense, for, especially with a provision in the

charter such as we have before us, that *right* must be dependent upon the question whether the subscriber continues to hold his stock until the time of the increase. It is not the *original subscriber*, but the *then holder* of the *original stock* that is entitled to the increase. It is not the person who was stockholder when the increase was proposed, but the one who was such when it was determined on in the method required by the charter. If Mr. Brooks had agreed on November 1, 1898, to take the one hundred shares, instead of waiving his right to do so, can it be said that he, and not the appellee, would have been entitled to the increase? Most assuredly not. He could not have demanded it from the company, for it was an incident to the stock which the appellee then owned and the right to the increase belonged to the latter by reason of the fact that he owned the stock at the time of such increase, and Mr. Brooks' act could not deprive the appellee of the right to exercise his option. The company was not a party to the agreement of November 1st, and was in nowise bound by it, even if we leave out of consideration the question of its power under the charter to let one who was not a stockholder, *at the time*, have the new stock to the detriment of one who was.

3. Much of the argument of the respective counsel was addressed to the question as to how far a *bona fide* assignment of stock, without notice of any existing equities, is affected by them. After what we have already said, it would serve no good purpose to enter into an extended discussion of this branch of the case. The authorities, with great unanimity, do hold that certificates of stock are not, strictly speaking, negotiable instruments, and the term " quasi negotiable " is not considered altogether satisfactory, although, as said in *Daniel on Negotiable Instruments* (sec. 1708) " it describes better than any other short-hand expression the nature of those instruments which, while not negotiable in the sense of the law merchant, are so framed and so dealt with as frequently to convey as good a title to the transferee as if they were negotiable." In 1 *Cook on*

*Stocks, etc.,* sec. 416, the author in discussing the law of estoppel, as applicable to transfers of stock, says '' indeed to such an extent has the law of estoppel been applied to protect a *bona fide* purchaser of stock that he is protected now in almost every instance where he would be protected if he was purchasing a promissory note or other negotiable instrument.    The Courts are steadily extending the application of the law of estoppel herein and in the course of time it is possible that certificates of stock may become more negotiable than negotiable instruments themselves.'' Without intending to unite in the prophecy of the learned author as to what may yet be done, the fact is that Courts have felt called on, *ex necessitate rei,* to free certificates of stock from many of the burdens that most non-negotiable instruments are required in law to carry.    If a negotiable instrument is, as has been said of it by a distinguished jurist, " a courier without luggage " a certificate of stock in the form now usually followed might at least be said to be "a courier without *much* luggage."    If, as was decided in *Farmers' Bank* v. *Iglehart,* 6 Gill, 50 ; *Reese* v. *Bank of Commerce,* 14 Md. 271, and *Hammond* v. *Hastings,* 134 U. S. 401, corporations are protected by reason of provisions in their charters of which the purchasers of stock must take notice, upon what principle should the purchasers be denied the protection and rights the charters give them ?    There was not only no provision in this charter which gave a purchaser notice that the company had the right to accept of a stockholder such a waiver of the increase of stock as would bind those who became purchasers of that stock before the increase was made, but the charter limited the right to the stockholders "at the time of the increase," and a purchaser might well assume that such right would be preserved. This certificate was issued after the alleged waiver by Mr. Brooks, and if the company desired, or had the power to protect itself against that provision in the charter, it should have noted the fact of the waiver on the certificate.    As the company was aware of the purchase by the appellee before

its actual allotment of the new stock—before it could allot it—and as he was a *bona fide* purchaser of the fifty shares of the original stock, for value, and without any notice of the attempted waiver by Mr. Brooks (even if it be conceded that he could waive it so as to bind himself when he signed that agreement), the appellee was not bound by that act of Mr. Brooks, but took the stock without in anywise being affected by such attempted waiver. *Grafflin* v. *Woodside*, 87 Md. 152; *Brandt* v. *Ehlen*, 59 Md. 25; *Knox* v. *Eden Musee*, 148 N. Y. 454, and other cases might be cited in support of this conclusion.

The jurisdiction of a Court of Equity to grant the relief given by the decree is fully sustained by the authorities referred to in the first part of this opinion, and as the amount of damages to be allowed, in the event of the case being determined in favor of the appellee, was fixed by agreement, it is unnecessary for us to discuss those questions and the decree will be affirmed.

*Decree affirmed, the appellant to pay*
*the costs.*