# Staunton

## PERCIVAL J. STEINDLER, ET ALS V. VIRGINIA PUBLIC SERVICE COMPANY, A CORPORATION.

September 20, 1934.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Gregory and Browning, JJ.

The opinion states the case.

*Christopher B. Garnett,* for the appellants.

*Leo P. Harlow* and *Marshall H. Lynn,* for the appellee.

CAMPBELL, C. J., delivered the opinion of the court.

The appellants instituted a suit in the Circuit Court of the city of Alexandria, the *situs* of appellee, to compel the appellee to transfer on its books, to appellants, eighty shares of preferred stock of the appellee, alleged to be owned by appellants, and to issue new certificates therefor to appellants. The bill or complaint also contained a prayer for damages in an amount sufficient to compensate appellants for the decline in the market value of the stock subsequent to the refusal of transfer.

Percy G. Dixon and William H. Humphries, the original owners of the eighty shares of stock, filed an intervening petition, alleging that they had been induced by fraud perpetrated upon them by one James Wallace and .........
Davies, to part with said stock, and, claiming the ownership of the stock, prayed that new certificates be issued to them.

The court by final decree denied the prayer of the intervenors, required the appellee to transfer the eighty shares of preferred stock to appellants and to issue and deliver to appellants the usual and proper certificates, and to pay appellants all dividends accrued thereon, with interest to date of payment; but the court refused to require the appellee to respond in damages in accordance with the prayer of the bill.

Since that adjudication the terms of the decree have been fully complied with by appellee. Upon proper petition, appellants were allowed an appeal from so much of the decree as refused to grant the prayer for damages. The intervenors have acquiesced in the decree, but appellee, by an assignment of cross-error, challenges the action of the chancellor in finding that appellants were entitled to have the stock involved herein transferred to them upon the books of the corporation, and the requirement of dividend payments.

The facts upon which this suit rests are these: Dixon and Humphries, intervenors, were citizens of Rockbridge county. On the 21st day of August, 1931, Percy G. Dixon was the owner of sixty shares of seven per centum preferred stock of the Virginia Public Service Company, a Virginia corporation, and had in his possession proper certificates therefor. William H. Humphries was the owner of twenty shares of said stock and was possessed of a proper certificate therefor. On the 21st day of August they were jointly visited by two men who were strangers to them and who gave their names as James Wallace and Mr. Davies. They stated to Dixon and Humphries that one of them, Wallace, was a representative of a New York bank having connections with the Virginia Public Service Company, and that the other, Mr. Davies, was a representative of the company and was engaged in soliciting the participation of stockholders of the company in a pool which was being organized to trade in, or deal with, the stock of an alleged corporation known as the "Perpetual Self Winding Watch Company."

During the course of the conversation Davies showed to Dixon and Humphries a letter written on the alleged stationery of the Virginia Public Service Company, which purported to have been signed by Lewis Payne, vice-president, and authorized Davies to represent the company in connection with the transaction. Wallace and Davies also exhibited a printed form, headed "Virginia Public Service Company," purporting to be a communication from the company urging its stockholders to participate in the pool. So impressed were Dixon and Humphries with the false and fantastic representations of Wallace and Davies in regard to the pool, that they endorsed their certificates of stock by signing their respective names to the blank forms of assignment and power of attorney printed thereon and delivered the stock to Wallace, who in turn receipted therefor.

Dixon and Humphries, upon request, gave to Wallace and Davies a note to T. V. Strickler, cashier of the First National Bank of Buena Vista, Virginia, requesting him to

guarantee their signatures on the certificates. Some time later in the day, two men, who were unquestionably Wallace and Davies, called at the bank, presented the note, produced the certificates and requested Strickler to guarantee the signatures, which request was complied with.

On the morning of the 22nd of August, a man giving his name as Fred Kayser presented all of the stocks of Dixon and Humphries at the office of the Central Hanover Bank and Trust Company, stock transfer agent of the Virginia Public Service Company, at 70 Broadway, New York City, and requested a transfer of the stock and the issuance of new certificates therefor in his name. After requiring Kayser to secure the guarantee of the Chase National Bank as to the genuineness of the signature of its correspondent, the Bank of Buena Vista, the clerk cancelled the old certificates and delivered the new ones to Kayser. On the afternoon of August 22nd, after the delivery of the stock to Kayser, the Central Hanover Bank was notified by Dixon and Humphries of the "swindle."

On the morning of August 24th, pursuant to an appointment made by a Mr. Bach, Kayser went to the office of Shields and Company, brokers, and offered the stock certificates for sale. Bach had known Kayser under the name of Marshall, and after a conference with another member of the firm, the offer of sale of the stock was declined, on the ground, as stated by Bach in his deposition, that the stock was not a New York Exchange security, and on the further ground that it was in a different name than Marshall. Upon being advised of this decision, Kayser, or Marshall, asked the names of some unlisted security houses and was given several, including that of appellants.

The same morning, August 24th, plaintiff received a telephone call from a man giving the name of Fred Kayser and stating that he had been referred to them by Mr. Bach, with whom Mr. Steindler had been acquainted for some years. This caller stated further that he had eighty shares of Virginia Public Service Company preferred stock to sell, and asked the price, then gave an order to sell at par and

said he would bring the stock in later in the day. About two hours later a man arrived with the Kayser certificates, which Mr. Steindler examined and had verified by Mr. Preller, who called the transfer agent and ascertained that certificates numbered in accordance with the numbers on the certificates offered had been issued in the name of Fred Kayser under date of August 22nd, the date shown on the certificates, and that the address given the transfer agent was the same as the address given by the supposed Kayser to plaintiffs.

With that information, according to plaintiff, Steindler: "We proceeded to consummate the transaction with Mr. Kayser." This consummation consisted of drawing a check of plaintiffs' firm to the order of Fred Kayser for the sum of seven thousand, nine hundred and ninety-six dollars and eighty cents ($7,996.80)—being at the rate of $100 per share for the eighty shares of stock, less cost of transfer stamps—and delivered this check in exchange for the certificates presented.

After the purchase the certificates were sent by plaintiffs to their bank, the Trust Company of North America, for the purpose of having same transferred and then held subject to delivery whenever sold by plaintiffs. Several days later the bank reported to plaintiffs that the certificates had been returned marked "Transfer stopped." No explanation was given plaintiffs by their bank as to the reasons for the stoppage, and no testimony was offered by plaintiffs as to what, if any, reasons were given to their bank. Several days later plaintiffs were visited by a representative of the National Electric Power Company (a holding company at that time controlling the Virginia Public Service Company), who inquired into the circumstances of their acquisition of the stock and informed them that there was some irregularity in the transaction by which Kayser had obtained the stock.

Following several conversations between officials of the National Electric Power Company and counsel for plaintiffs, formal demand for the transfer of the stock was made on behalf of the plaintiffs by letter dated September 21,

1931, from their counsel to the Virginia Public Service Company, to which reply was made by letter dated September 24th, refusing the transfer, unless and until plaintiffs produced the alleged assignor, Fred Kayser, to acknowledge in person, although appellants offered to execute an indemnifying bond holding appellees harmless in the matter of transfer.

Two questions are presented for our consideration.

(1) Did the court err in compelling appellee to transfer the stock upon its books to appellants? If the answer should be in the negative, then the cross-assignment of error is without merit. In the answers filed by the intervenors and appellee no claim is made that appellants participated in the fraud practiced by Wallace and Davies upon intervenors, or that they had any knowledge thereof. The basis of appellee's refusal is that it had the right to demand the production of Kayser before making a transfer of the stock. Appellants contended in the lower court, and contend here, that if the proof shows that they were *bona fide* holders for value of the stock, then they were entitled to the transfer.

It is conceded that both Virginia and New York have adopted the Uniform Stock Transfer Act, so there can be no question as to a conflict of law. The pertinent provision of the act appears as Code, section 3848(2). Under that section the question of the negotiability of the shares of stock herein involved is concluded.

(2) Were the appellants *bona fide* holders for value without notice? Under the facts stated, the question must be answered in the affirmative.

This conclusion disposes of the cross-assignment of error and brings us to a consideration of appellants' assignment of error, that the chancellor erred in decreeing that appellants were not entitled to damages for the alleged loss suffered, due to the fall in the market value of the stock. While the specific question is one of first impression, this court has uniformly held that where equity has once acquired jurisdiction of a cause, it may go on to complete adjudication, even to the extent of establishing legal rights

and granting legal remedies. *Walters* v. *Farmers Bank*, 76 Va. 12. See, also, *Chichester's Ex'x* v. *Vass' Adm'r*, 1 Munf. (15 Va.) 98, 4 Am. Dec. 531; *Johnston & Grommett Bros.* v. *Bunn & Monteiro*, 108 Va. 490, 62 S. E. 341, 19 L. R. A. (N. S.) 1064; *Brown* v. *Ford*, 120 Va. 233, 91 S. E. 145.

In *Nagle* v. *Newton*, 22 Gratt. (63 Va.) 814, it appears that Newton instituted a suit to enforce the execution of a contract for the sale of land. The defendant answered and expressed his willingness to perform on his part if and when the court awarded him compensation for the damages he had sustained in consequence of certain acts of the complainant. In holding that defendant was entitled to compensation for the damages sustained, Judge Christian goes at length into the question of whether or not a court of chancery may, as an incident to the relief sought in a case of specific performance, award damages by way of compensation. In the course of the opinion this is said:

"But the case before us is one in which specific performance was decreed, and was manifestly a case in which specific performance ought to have been decreed. The court, therefore, having full and complete jurisdiction, and having properly exercised that jurisdiction in decreeing specific performance, the only question is, whether or not the court of chancery may not, as an incident to the relief sought, or collateral to the specific performance, which would otherwise be inequitable, direct an enquiry as to the damages which the defendant has sustained in consequence of the acts of the plaintiff or his agents; or whether the case must be retained in the court of chancery until the question of damages can be ascertained in another form [forum], to-wit: In a court of law.

"As before intimated, we think the doctrine on this subject is now well settled, and may be succinctly stated to be this: That where the court of chancery has jurisdiction of the case, and where it is a case proper for specific performance, it may, as ancillary to specific performance, decree compensation or damages; and where the ascertainment of damages is essential, in order to do complete justice between

the parties in the case before it, the court ought not to send the parties to another forum to litigate their rights; but should refer the matter to one of its own commissioners, or direct an issue *quantum damnificatus* to be tried at its own bar. 2 Story, Eq. Ed. 1866, secs. 798-9, note; Fry on Specific Performance (2nd Am. Ed.) p. 448.

"The last named author, treating of the subject under consideration, says: 'In early times the courts did not entirely disclaim jurisdiction in respect of damages, where they were incident to the subject matter already in contention before the court. Subsequently, however, the jurisdiction was disowned, and a broad distinction set up between compensation and damages.' After some comments on a decision of Lord Eldon on this subject, he proceeds: 'At present, however, the courts manifest an inclination to return to the original view of its jurisdiction, and to assist in the ascertainment of damages where these are essential to complete justice in the case before it.'

"In a recent English case, *Prothero* v. *Phelp,* 25 Law Jour. ch. 105 (L. J. J.), Lord Justice Turner said: 'That it is competent for this court to ascertain damages, I feel no doubt. It is the constant course of the court in the case of vendor and purchaser, where a sufficient case is made for the purpose, to make inquiry as to the deterioration of the estate: and in so doing, the court is, in fact, giving damages to the purchaser for the loss sustained by the contract not having been literally performed.'

"It is impossible not to see the great propriety of courts of equity being clothed with such a jurisdiction; so that in cases coming before them by way of specific performance, complete justice may be done to suitors, without their resorting to any other forum. Under the modern practice of courts of equity, aided by legislative enactment, these courts are now provided with all the machinery necessary to aid its jurisdiction to make an end of a cause properly before it. An issue out of chancery may now be tried at its own bar, instead of being sent (as formerly) to a court of law for trial. One manifest object of legislative changes in the

administration of the law has been to enable courts of law and courts of equity to do complete justice in matters arising within their respective jurisdictions; and it is in entire accordance with this that courts of equity proceed by way of damages in cases where they properly have jurisdiction, and where complete justice requires the payment of damages.

"It is impossible, therefore, to perceive either the necessity or propriety, in a case like this (where the court has complete jurisdiction of the subject, and with all the parties before it, and where a specific performance has been decreed), of sending the parties before another forum, in order to litigate rights arising directly out of the subject before the court of chancery, and especially where specific performance would be inequitable, and complete justice could not be done without an adjustment of these questions. Why should the cause be divided into two suits—a part of the controversy to be adjudicated in a court of equity, and a part in a court of law? Why should two distinct and independent tribunals be invoked to dispose of a cause between the same parties, where their respective claims are so connected as to be inseparable? Why call upon a court of law to aid the court of equity, which has the undoubted original jurisdiction of the subject matter and of the parties, and is provided with all the machinery necessary to arrive at the same result, and in the same mode, if need be (trial by jury), which could be attained in a court of law? We cannot perceive the necessity or the propriety of such a practice. Nor can we find any authority among the modern decisions to require it."

In *Ewing* v. *Litchfield,* 91 Va. 575, 579, 22 S. E. 362, 363, Judge Keith cites with approval the *Nagle Case,* and says: "There are cases in which courts of equity will award damages, but they are cases where, having obtained jurisdiction over the subject and of the parties, under some of the well recognized sources of equity jurisdiction, it is found necessary to award damages in order to do full and complete justice by way of compensation, as when, in the enforce-

ment of a contract for the sale of land, the court finds itself unable to give the party seeking, and entitled to its aid, all that under his contract he should recover. In such a case the court will, as far as possible, specifically execute the contract, and then ascertain the damages accruing by reason of its inability in the particular case thus to afford complete relief. The giving of the damages is ancillary or auxiliary to the jurisdiction specifically to enforce the performance of the contract. See *Nagle* v. *Newton,* 22 Gratt. [63 Va.] 814."

See, also, *Grubb* v. *Starkey,* 90 Va. 831, 20 S. E. 784.

In *Travis* v. *Knox Terpezone Co.,* 215 N. Y. 259, 109 N. E. 250, L. R. A. 1916A, 542, Ann. Cas. 1917A, 387, a stockholder instituted a suit in equity against the corporation and its officers to compel the defendant corporation to transfer certain stock to him and to deliver new certificates therefor, and award damages flowing from defendant's failure to transfer. The bill also contained a prayer to declare illegal an election of directors. We are only concerned with the court's disposition of the first two questions. On demurrer, the court sustained the court's jurisdiction to decree a specific performance of the contract and to award damages as incidental to the right to have the contract executed. The opinion of the court was delivered by Judge Cardoza. There we read:

"The question before us at this time is not whether the plaintiff is entitled to all the relief demanded. The question is whether he is entitled to any relief. * * * The primary purpose is to compel the transfer of the shares on the corporate books and the delivery of new certificates. That is the relief which the courts of this state are competent to grant. * * * To what extent control of foreign corporations may be exerted through mandamus is perhaps an open question. * * * The plaintiff makes an appeal to a very different jurisdiction. His forum is a court of equity, and his grievance a breach of contract. We are satisfied that in such a forum, and with such a grievance, he is entitled to relief. * * * It is the enforcement of a contract between the corporation and its member. The shares in controversy

have been issued; they have been assigned to the plaintiff; he is their owner, both in law and in equity; and all that remains to be done is to register a perfected right. *Robinson* v. *National Bank of New Berne*, 95 N. Y. 637, 641. From the moment of the tender of the certificates and the refusal to transfer them, the corporation was bound to pay dividends to the plaintiff and otherwise to recognize his rights as shareholder 'as if it had done its duty and made the transfer on its books.' *Robinson* v. *National Bank of New Berne, supra.* We are not dealing here with an original issue of stock. Whether any different considerations apply to such an issue, we do not now decide. * * * We are protecting the plaintiff's ownership of shares already issued."

■ Citing *Travis* v. *Knox Terpezone Company* as authority, this rule is laid down in 14 Corpus Juris, sec. 1169:

"A bill or complaint in equity against a corporation to compel it to transfer stock on its books is governed by the rules which regulate such pleadings in equity generally. * * * The prayer of the complaint may be in the alternative, for the registration and delivery of the stock or for its value, or for the registration of the stock and to recover unpaid dividends; and damages from the failure to make the transfer which are incidental to the equitable relief may properly be prayed for in the same action, and unless such damages are properly alleged, they cannot be recovered." Citing *Real Estate Trust Co.* v. *Bird,* 90 Md. 229, 44 Atl. 1048, and *Travis* v. *Knox Terpezone Co., supra.*

In Thompson on Corporations (3d Ed.), at page 291, it is said: "Damages due to the failure to make transfer may be claimed in the same suit as incidental to the equitable relief."

An interesting case is that of *Serrao* v. *Noell,* L. R., 15 Q. B. Div. 549. That case was an action at law to recover "for damages in respect of loss by the fall in values in shares"—the shares having theretofore been decreed to plaintiff in a chancery suit filed to execute a transfer contract. The defendant pleaded by way of estoppel, or *res*

*judicata,* the decree of the chancery court. In the *nisi prius* court the plaintiff prevailed. On appeal the judgment was reversed, the unanimous opinion of the court being that the plea of estoppel or *res judicata* was good.

Bowen, Lord Justice, in his opinion said: "I, too, am of opinion that the defendant is entitled to judgment. The principle is that where there is but one cause of action, damages must be assessed once for all. The plaintiff relies upon a certain cause of action; was this cause of action capable of being litigated in the suit in the Chancery Division? If that had been an action of detinue at common law, the jury in their assessment could have included, not only damages for the original wrongful detention, but also damages for the detention until the shares be re-delivered; damages might have been assessed once for all. The suit in the Chancery Division was an application to the High Court of Justice for all kinds of relief in order that the rights of the parties might be adjusted. It may be said that the plaintiff did not claim damages in the suit in the Chancery Division. I am not sure that he did; the primary object of the action was that it should be a proceeding to obtain the re-delivery of the shares, and perhaps it did not occur to the plaintiff to make it clear that he intended to include a claim for damages; but if the application had been made, the court would have amended the claim, so as to enable the plaintiff to claim damages, and therefore damages not only could have, but also would have, been assessed at the time of the trial in the Chancery Division. In the present case it was a redelivery of the shares made upon an arrangement arrived at in the course of the suit; the cause of action now litigated is the detention of the shares; that cause of action was litigated in the Chancery Division, and therefore the two actions are in respect of the same cause."

In our opinion the appellants have come into a court of equity with "clean hands" and have done all that the law requires of them. They bought stock under circumstances which under all the rules of modern business they had a right to buy. When denied the right by appellee to have

the stock transferred, they offered to indemnify appellee by executing a valid bond. They have paid their money for stock which they were entitled to purchase. That they have incurred a loss by the illegal refusal of appellee to transfer is apparent from the proof that a certain amount of the stock had already been sold. The modern trend of the courts is to afford litigants an expeditious remedy in the assertion of their right. Though it may be a departure from the usual result arrived at in a suit for the specific performance of a contract, we perceive no valid objection to ending the litigation in one proceeding.

We are, therefore, of opinion that the lower court should have ascertained the damages, if any, to which appellants were entitled. The decree to that extent will be reversed, and the cause remanded for the settlement of the question of damages.

*Reversed and remanded.*