BATES v. UNITED SHOE MACHINERY CO.

(District Court, E. D. New York. May 21, 1913.)

**1. CORPORATIONS (§ 158*)—RIGHT TO NEW STOCK—DENIAL—NECESSITY OF TENDER.**

Where defendant corporation wrongfully refused to transfer stock on its books, the certificate for which, with a power of attorney to transfer, was held by complainant's predecessor in title, and denied his right to subscribe for his share of a new stock issue on the ground that only registered stockholders had such right, an actual tender of the price for the new stock would have been useless and was not necessary to preserve complainant's rights.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 449, 587–592; Dec. Dig. § 158.*]

**2. CORPORATIONS (§ 158*)—STOCKHOLDERS—RIGHT TO SUBSCRIBE FOR NEW STOCK.**

A transferee of certificates of stock of a corporation, with power of attorney to transfer, presented the same and demanded their transfer on the books. The corporation authorized a new stock issue to which all stockholders of record on a certain date were given a preference right to subscribe. *Held*, that such stockholder had the right to act on the assumption that his stock had been duly transferred, and to preserve his right to make the subscription was not required to offer to subscribe in the name of the prior holder, although through the wrongful act of the company the transfer had not been made.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 449, 587–592; Dec. Dig. § 158.*]

**3. CORPORATIONS (§ 158*)—RIGHT OF STOCKHOLDERS TO SUBSCRIBE FOR NEW ISSUE—ENFORCEMENT IN EQUITY.**

Where a corporation has authorized a new stock issue with a preferred right in each existing stockholder to subscribe for his proportionate share of the new stock, such right of a stockholder to retain his relative interest in the property and control of the corporation is a substantial right which he may enforce by a suit in equity, and cannot be compelled to resort to an action at law for damages.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 449, 587–592; Dec. Dig. § 158.*]

In Equity. Suit by Jerome E. Bates against the United Shoe Machinery Company. Decree for complainant.

Lexow, Mackellar & Wells, of New York City (George M. Mackellar and Martin A. Schenck, both of New York City, of counsel), for complainant.

Griggs, Baldwin & Baldwin, of New York City (John W. Griggs, of New York City, and Walter Bates Farr, of Boston, of counsel), for defendant.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

CHATFIELD, District Judge. This action was presented upon an amended complaint, verified December 27, 1905, and an answer thereto, verified February 15, 1906. Issue having been joined by the filing of a replication, testimony was taken and filed and the case argued in 1912, upon the printed proofs. The statement of facts is complicated, and the conclusions to be drawn from the different items of testimony are more difficult, generally speaking, than the determination of what occurred on the different occasions named. Few of these facts are disputed, and, as these can be referred to subsequently, a general statement of the matter (which may be equivalent to a finding of the incidents therein stated) can be made at the outset.

The United Shoe Manufacturing Company was organized in 1899, under the laws of the state of New Jersey. Another corporation, called the United Shoe Machinery Company of Maine (previously called the Goodyear Shoe Machinery Company), had been organized in 1893. Substantially the same men held corresponding offices in each corporation and the board of directors was the same. But this suit has to do only with the New Jersey corporation.

One William H. Coolidge, who later had a part in the matters referred to herein, was a director in the New Jersey company until the month of February, 1900, but never held an office therein.

Prior to 1899, the Consolidated & McKay Lasting Machine Company had been formed from the union of the Consolidated Hand Method Lasting Machine Company with other interests, and on that date its stock had been exchanged for stock in the United Shoe Machinery Company.

The persons thus becoming stockholders of record in the United Shoe Machinery Company later obtained the right to share in an issue of increased capital stock, of 73,174 shares of common, at par. The right of subscription was given to the "stockholders of record" at the close of business on March 23, 1901, and the subscription and first payment had to be made "on or before April 24, 1901, at 2 p. m." Every 10 shares of preferred or common stock was entitled to subscribe for one share of common stock ($25), and any portion of this issue not subscribed for was to be disposed of as the board of directors might determine for the best interests of the company. This action was taken upon the 14th of March, 1901, and upon the 16th of March, 1901, the executive committee made the formal offer requiring subscriptions to be paid in full or in stated amounts, and providing that the certificates of stock issued should participate in the dividends to be declared in September, 1901, and thereafter. Receipts were to be given for partial payments, to be returned when the stock was issued, and all subscription payments were to be made to the American Loan & Trust Company, at 53 State street, Boston, or to the Hanover National Bank in New York. Under this subscription, certificates of the new stock were issued to the number of 70,519 shares, in addition to which 492.1 shares, standing in the name of "James Cavanagh, trustee under the instrument of May 16, 1887," were claimed but not issued, 5 shares were claimed by another party, and 2,157.9 were undisposed of.

It appears from the record that the complainant's claim relates to 471 of the 492.1 shares above referred to, and the remaining 22.1 shares appear to have nothing to do with the case.

In 1905, the United Shoe Machinery *Corporation* of New Jersey was organized, with $50,000,000 capital stock, having the same officers as the United Shoe Machinery Company of New Jersey, and the stock of the "old" company was purchased by the "new" *corporation,* at the rate of 1½ shares common and 75 cents cash for each share of the *company,* while 1 share preferred stock of the *corporation* and 37½ cents cash was paid for each share of preferred stock of the *company.* No disposition was made of the 492.1 shares of the *company* classified as "claimed by Cavanagh." The stock of the *corporation* was increased in 1906, by giving the right to subscribe for a share of common at par for every 10 shares then held, and in 1907 a stock dividend of 1 share to 4 was issued to the holders of common stock. But in these increases no action was taken making any change in the status of the shares claimed by Cavanagh.

Upon the exchange of the stock of the *company* for that of the *corporation,* a sufficient amount was undisposed of to satisfy any rights with relation to the 492 shares affected by the Cavanagh claim, and in the subsequent increases there are also sufficient reserve shares to comply with any demands that might arise from claims with respect to the stock in question.

Dividends were declared by the company and by the corporation from time to time, upon their common and preferred stock; but the dividends belonging to the 492.1 shares of stock labeled as "claimed by Cavanagh" have been withheld. Notice was given upon the 22d of April, 1901, that interest upon the dividends which had accrued before that time would be claimed for the period during which the dividends were unpaid. This notice was given in writing by the attorney for the complainant's predecessor in title to the machinery company.

The complainant makes out his title in the following way: An association of interests, known as the Scott Lasters' Association, transferred its stock, under date of May 13, 1887, to James Cavanagh as special trustee, in order to effect the consolidation then planned. Exchanges of stock, by the Scott Lasting Machine Association and the Hand Method Power Lasting Machine Company, for that of the Consolidated Hand Method Lasting Machine Company, resulted in the formation, as stated above, of the Consolidated & McKay Lasting Machine Company. 3,141 shares of this Consolidated & McKay Lasting Machine Company were set aside or held for the interest of A. H. Jackman, who had been one of the persons associated with James Cavanagh in the Scott Lasters' Association. But during this period, A. H. Jackman had assigned his rights therein to the Jackman Shoe Manufacturing Company, and also during this period—that is, in 1893— proceedings had been brought in the New York Supreme Court for the dissolution of the Jackman Shoe Manufacturing Company. James Cavanagh (Jackman's former associate) was appointed receiver and also claimed individually some of this stock, bringing suit in Massachusetts to substantiate this personal claim.

The principal creditor of the Jackman Shoe Manufacturing Company was Jerome E. Bates, the complainant in the present action, who, because of this (Cavanagh) claim, undertook to have Cavanagh removed as receiver, and who succeeded in obtaining an order, on the 24th day of June, 1899, under which Benjamin B. Odell, Jr., was appointed receiver in the place of Cavanagh. The latter was directed to turn over to Odell as receiver all of the property and assets of the Jackman Shoe Manufacturing Company.

It will thus be seen that, upon the 23d day of March, 1901, Odell as receiver was in possession of the claim of the Jackman Shoe Manufacturing Company to the stock (listed upon the books to James Cavanagh, trustee) of the United Shoe Machinery Company, and had the certificate which in the meantime should have been transferred to his name, and if it had been so transferred would have entitled him as a record stockholder upon that date, viz., March 23, 1901, to the subscription for the additional stock, and hence to any future benefits (including the transfer for the stock of the United Shoe Machinery Corporation).

Upon the 9th day of March, 1903, a decree was made in an action brought in New Jersey by Odell, as receiver, against the United Shoe Machinery Company and others, adjudging the receiver to be the lawful owner and holder of the 4,711 shares of common and preferred stock above referred to. It was held that he was entitled to all dividends and accumulations thereon and to the transfer of the stock to himself as receiver. The defendant was directed to transfer this stock upon its books and to issue certificates therefor to Odell as receiver, and these transfers were made. Subsequently, upon the 16th day of January, 1904, a decree in the same action was entered by which the complainant herein, Jerome E. Bates, who was, as has been said, a creditor of the Jackman Shoe Manufacturing Company, was held entitled to the 3,141 shares of common and 1,570 shares of preferred stock held by Odell, with all rights of subscription and of all actions and causes of action with respect thereto. This decree was carried into effect, thus making the complainant the record holder upon the books of the defendant—that is, the United Shoe Machinery Company—of 4,711 shares of stock (common and preferred) which in turn appear to have participated in the exchange of stock with the United Shoe Machinery Corporation.

With the course of these 4,711 shares subsequent to the 16th of January, 1904, we have nothing to do, and the present action relates only to the rights as to the subscription, which could have been made upon those shares by the record holder on March 23, 1901, under the offers above described, and which the complainant alleges were preserved or made complete by proper demand and tender by Odell as receiver, coupled with knowledge on the part of the defendant and its successors of his claim and of the facts above set forth. That is, the complainant claims 471 shares of the capital stock of the defendant (which we shall hereafter call simply the "company"), together with any dividends actually unpaid thereon, and with any subscription rights

attaching thereto as against the United Shoe Machinery Corporation (which we shall hereafter refer to as the "corporation").

The questions of fact in the case have to do entirely with the notice which was given and the demands which were made with respect to the stock held by Odell as receiver, during the period when the record owner of this stock was entitled according to the defendant's contention, if properly identified and recognized, to the benefits of the subscription rights which would secure the 471 shares comprised within the 491.1 shares unissued and identified by the words "claimed by Cavanagh."

The question of law is simply whether Odell as receiver (having in his possession the certificates of stock of the McKay Company) was entitled to and legally made demand for the rights which he could have exercised if this stock had been exchanged and registered in his name with the defendant company.

The defendant also sets up as bearing upon the question of law, and as a justification for the refusal to accede to the demands of the complainant or of his predecessor, Odell as receiver, a restraining order in a suit brought by one Scott, with respect to the Jackman stock, standing in the name of Cavanagh as trustee, and which the complainant insists was a collusive action, brought at the instigation of the defendant to prevent the stock in question from participating in the possible benefits.

The defendant has also set up the defense of lack of jurisdiction of a court of equity with respect to the delivery of shares of stock dividends and possible interest thereon, which it alleges have at all times been either liquidated in value, or, in the case of the stock, purchasable in the open market, and as to which a remedy at law could be ascertained and measured in dollars and cents, from the standpoint of damage for deprivation. The defendant asks therefore to have the bill now dismissed and to remand the complainant to his remedy in an action at law for damages.

It will be noticed that the Consolidated & McKay Lasting Machine Company stock was forwarded by Cavanagh to the transfer agent of the defendant the American Loan & Trust Company, who raised a question as to the trust suggested by the words "James Cavanagh, trustee." Before the certificates were issued to Cavanagh, as trustee, on the 24th of May, 1900, inquiry was made at the office of Gen. Patrick A. Collins, in Boston, and a paper was found dated May 16, 1887, and headed "Office of the Scott Lasters' Association, James Cavanagh, Trustee." In this the secretary of the Scott Lasters' Association certified that the stockholders had, upon the 13th of May, 1887, for the purpose of forming a new company, agreed to transfer all of the stock to James Cavanagh, as special trustee, for the purpose of effecting the said consolidation.

Among these stockholders was A. H. Jackman, and a part of Jackman's share was the 3,141 shares of common and 1,517 shares of preferred stock which were ordered to be transferred to Benjamin B. Odell, Jr., receiver, as above set forth. This order was not at once carried out, and an application to punish Cavanagh for contempt re-

sulted in the transfer by him, later in the year 1900, of the stock and all claims for dividends or rights accruing from the ownership of the stock to the said Odell, as receiver. This transfer was subject to a claim by Fayerweather & Ladew, which was then in process of litigation but was subsequently determined in favor of the receiver.

Upon the 24th day of May, 1900, a certificate was issued by the United Shoe Machinery Company, countersigned by the American Loan & Trust Company, for 1,570 shares of preferred stock, in the name of "James Cavanagh, trustee, under instrument of May 16, 1887." This particular certificate was indorsed and delivered, on the 16th day of August, 1900, to Odell as receiver of the Jackman Shoe Manufacturing Company, with power of attorney to transfer the said stock on the books of the defendant. A similar certificate with respect to 3,141 shares of *common* stock was also, on May 24, 1900, issued to "James Cavanagh as trustee," and also, under the same circumstances, transferred by Cavanagh, through an indorsement, to Odell as receiver, upon the 16th day of August, 1900, thus giving Odell the necessary power of attorney to transfer this stock on the books of the company.

So far, therefore, as the purposes of this suit are concerned, we have upon the 16th day of August, 1900, certificates of the defendant, outstanding, recognizing the rights in 1,570 shares preferred and 3,141 shares common, which stood in the name of James Cavanagh as trustee (or properly as agent for certain purposes of some of the Jackman stock), and, in so far as these could be transferred by Cavanagh, we find Odell, as receiver, authorized to have this transfer and his claim to this stock registered by the defendant upon the books of the company.

Odell attempted to have this transfer made, according to the complainant's testimony, through correspondence and interviews by his attorney with one William H. Coolidge, who had been attorney for the Consolidated & McKay Lasting Machine Company and for the United Shoe Machinery Company, in the suit by Bates against the McKay Company which had been discontinued. He apparently participated in the negotiations with Odell, as an attorney at law, and discussed the matter with respect to the defendant's property and its rights, with knowledge of the defendant's officers, its general attorney or counsel, and the attorney for its transfer agent. The complainant assumed that Coolidge was acting as attorney for the defendant with respect to this stock, and addressed him in that capacity.

Question was raised by Coolidge that the trust under which Cavanagh held the stock must have been in writing, and that this writing must show whether Cavanagh had the authority **to transfer it to** Odell. Exhibit 7 (printed on page 121) says:

"So far as Cavanagh is concerned he has authorized, as I understand it, the stock to be transferred to Odell, but for the trust company it will be necessary to see just what his personal authority was in making any transfers from himself as trustee."

Such declarations by Coolidge cannot prove his agency, but do prove that he purported to act for the trust company, and if his action

206 F.—46

was authorized, or was in pursuance of conscious acts by the company's officers, holding him out as the trust company's and defendant's representative for this purpose, then his statements are admissible to bind his principal.

The paper found in Gen. Collins' office, which is dated May 16, 1887, and which has been called the trust "instrument," was, during the negotiations with Coolidge, exhibited to him. A copy was sent him in December, 1900, and there seems to be no question that it was known to the officers and counsel of the defendant as well. No transfer of the stock was made to Odell, however, and on March 27, 1901, Mr. Coolidge notified Mr. Choate, who was acting for the complainant herein and for Odell as receiver, that a bill in equity had been brought in the superior court of Suffolk county, by Jacob R. Scott against all the parties interested in this Cavanagh stock, and that the defendant herein had been enjoined on March 25th from transferring any of that stock during the pendency of the Scott suit.

Mr. Coolidge made the further statement, as shown in Exhibit 12 (on page 125 of the record):

"It is the knowledge that Scott makes this claim that has caused the delay on the part of the officers of the Shoe Machinery Company."

In Exhibit 13, Mr. Coolidge said that it was not the fault of the defendant that it was under injunction, and that it should not pay interest, but that the defendant was ready to pay over the money and stock whenever the court should decide to whom it belonged. This was in reply to a letter by Mr. Choate, calling attention to the accumulated dividends and demanding interest thereon.

We need not follow the details of that litigation, but can pass immediately to the result by which the right of Mr. Odell was established in the action in New Jersey.

The Scott suit had been discontinued, and the decree in the New Jersey action determined that Odell as receiver was entitled to the transfer of the stock in question and to all of the various rights to dividends thereon. This gave him the stock upon which he had claimed, in the correspondence with Coolidge, the right to be given a certificate showing his ownership, and he then made another tender and demand for the 471 shares demanded in this suit.

Upon the 23d day of March, 1901 (when the status of the registered stockholders who were entitled to subscribe to the additional stock was determined), upon the 18th day of April, 1901 (when Mr. Odell attempted, through the giving of a power of attorney to one Allen, to insist upon the transfer of the stock and the issuance of a certificate to him), and continuing up to the 24th day of April, 1901 (when payments for the subscription had to be completed), the demands of Odell were known to the defendant and were not recognized by it.

[1] Likewise, upon the 23d day of April, 1901, Mr. Bates, the complainant in the present action, and one Smith, met at Mr. Lexow's office, obtained according to the testimony the sum of $11,775, and went to the Hanover National Bank, which represented the American Loan & Trust Company of Boston, the transfer agent of the defend-

ant, where an interview was had with a Mr. Carse, for the purpose of subscribing to the increase of stock upon the certificate held then by Mr. Odell.

There is a dispute as to what happened at this interview. Mr. Bates and Mr. Smith claim that they made an actual tender for the stock, Mr. Carse denies the tender or the filling out of any subscription blank, but both parties agree that Mr. Carse investigated the list of stockholders and ascertained that the certificate held by Mr. Odell was not registered. Mr. Carse said or intimated that Mr. Odell could not subscribe in his own name, nor could the transfer to him be recognized without the approval of the American Loan & Trust Company, and no subscription blank was made out. Mr. Smith and Mr. Bates claim that Mr. Carse attempted to buy the right to subscribe from them, and this is denied by Mr. Carse.

But whatever may have happened as to that matter, it is evident that if the list of stockholders had contained the name of Odell as receiver, with respect to the stock in question, the subscription would have been made and apparently received, so far as anything appears from this record.

It is also evident that a subscription by Odell in the name of James Cavanagh as trustee would have availed nothing, and one by Smith and Bates for Odell would not have been received by Carse, as Odell was not a stockholder of record. On the other hand, a subscription by any of these men, as agent for Cavanagh as trustee, might have been one which Carse would have received and forwarded, even though he were desirous or willing to purchase the right to subscribe for himself or his principals. But such a subscription would have been affected by the injunction in the Scott suit, and would have indicated no more than the demands actually made by him, nor was such a subscription necessary, in the face of a refusal to recognize his right to the stock.

The only other question of fact that furnishes ground for argument in the matter is in connection with the Scott suit. The testimony would seem to show that the Scott suit was brought with the knowledge of some of the officers of the defendant, and that it was furthered by them, or at least acquiesced in by them. The expenses of bringing the action and of employing the attorney therefor were paid by the defendant, and this action was but an excuse or attempted justification for the questions raised and the objections presented by the defendant to a recognition of Mr. Odell's claims as receiver to some of the shares of the Jackman stock.

The record indicates that the purpose of the Scott suit was to present Scott's claim in opposition to Odell, and prevent the subscription to the stock in question by him, or by any one receiving title from Cavanagh. It appears that the defendant had knowledge of the situation and preferred to have the rights of the parties determined as a whole, with the risk of being entirely in the wrong, and to withhold the issuance of the additional stock and the payment of dividends until the various questions were determined.

For this reason, a decision that the Scott suit was entirely collusive

is unnecessary. The defendant is responsible for the situation which it allowed to exist during the time which the Scott suit was pending and during which it had knowledge of that litigation and of Odell's claim. The defendant was liable for all rights which Odell might have been entitled to and for all damages which resulted from the withholding of those rights, even though that withholding was not for the sole purpose of preventing him from obtaining the rights at the time when they could have been exercised by him. Under these circumstances, a tender by Odell was known to be useless, and the absence of such a tender would make no difference.

It must be held also that Mr. Coolidge represented the defendant sufficiently to bind it as to the matters which were discussed between him and Mr. Odell or his representatives, for the reason that the defendant has relied upon and acted upon everything which Mr. Coolidge knew and did during the course of these inquiries, and has, through the occurrences in connection with the Scott suit, recognized Coolidge's position in the matter, and hence plainly given him the necessary authority to make the representations from which the extent of the defendant's responsibility should be measured.

An actual tender by Mr. Odell or by Mr. Bates and Mr. Smith was not necessary in view of the position taken by the defendant, or by all of its representatives, including the transfer agent and Mr. Carse, or the Hanover National Bank in New York City.

The testimony of Mr. Lexow and of Mr. Bates shows that an actual and valid tender was possible. No reason is shown nor persuasive testimony presented to indicate that the tender was not in fact made, except that both parties to all the interviews in question recognized that the actual tender was unnecessary, and the manner of making the tender was therefore, to a certain extent, informal.

Under these circumstances, a party cannot be held in default for failure to comply strictly with conditions which are not insisted upon nor taken into account in determining whether or not the party who might have made the tender would be treated as having the right to do so.

[2] The next step to be considered is the failure of Odell to offer to subscribe in the name of Cavanagh as trustee. But inasmuch as Odell had given actual notice that Cavanagh's trust had been ended and that he was entitled to be considered the record holder upon the books of the company, and had made demand for such registry, and inasmuch as the right to subscribe was associated in the notice for the subscription with a notice that the transfer books of the company would be opened on the 1st day of April, 1901, to determine who were stockholders of record on the 23d of March, 1901, and as Odell's stock had been presented for registration prior to that time, we must consider that Odell had the right to assume that what should have been done had been done, and that the defendant company would perform its duty to complete the registration of his stock prior to the date in question, and to thus make his proffered tender good.

In other words, Odell in equity had the right to be treated as a stockholder of record, inasmuch as the defendant knew, or failed to

recognize at its peril, the title which had then vested in him, from which the right to be listed upon the books of the company as a stock-holder had been obtained.

The defenses of the Scott suit or of the possible Ladew claim, or of any cloud upon the title through the Cavanagh trust, had been removed, except as the defendant took the risk of relying thereupon. And it having subsequently been proven that the withholding of Odell's rights made the defendant a wrongdoer, he was entitled, and the complainant as his successor is entitled, to have his position and rights restored as they would have been, if properly recognized by the defendant, before March 23, 1901. The defendant cannot justify its conduct by suggesting that questions of title were involved as an excuse for the delay, and then rely upon its own delay when the questions have been decided against it. O'Neil v. Wolcott Mining Co., 174 Fed. 527, 98 C. C. A. 309, 27 L. R. A. (N. S.) 200. To do this would be to allow the defendant in equity to profit from its own wrongdoing. Real Estate Trust Co. v. Bird, 90 Md. 229, 44 Atl. 1048.

[3] Whether or not the exact relief claimed by the complainant is substantially beneficial to the complainant—that is, whether the defendant by the withholding of this stock has caused only monetary damage which the complainant could recover at law, or which he could have prevented by purchase of stock in the market—does not answer the question presented. As the issue has been stated, the complainant is entitled to be placed in the position in which he would have been if his rights had been recognized at the outset, and to an accounting for any property or moneys which he should have received.

The right of a stockholder to receive a proportionate share of the control or property of a corporation, when a part of that control or property is being disposed of to *the stockholders* who wish to maintain their relative position and to pay their share therefor, is a substantial and enforceable right. Stokes v. Continental Trust Co., 186 N. Y. 285, 78 N. E. 1090, 12 L. R. A. (N. S.) 969, 9 Ann. Cas. 738; Snelling v. Richard (C. C.) 166 Fed. 635; Gray v. Portland Bank, 3 Mass. 364, 3 Am. Dec. 156. (This was an action on the case.) If the stock is for sale on the open market, then the price thereof may establish the measure of damage, if judgment be recovered for the loss or deprivation of the stock. Gray v. Portland Bank, supra; Stokes v. Continental Trust Co., supra. If money damage is the relief asked, then no action for the shares of stock themselves should be brought in equity, and the remedy would be without reference to whether the shares could be delivered. An equitable action, however, need not be dismissed entirely, even if merely an accounting is needed, and if the complainant has had equitable rights which can properly be determined in the action, but for which no adequate remedy exists at law.

In the present case the complainant, or his predecessor, could have purchased stock on the market up to 1905. Since that he might have purchased the stock of the New Jersey *corporation,* but substantially all of the stock of the defendant (the *company*) has been exchanged for that of the corporation, except the surplus unused.

After the right to subscribe was closed on April 24, 1901, **however,**

two persons (one of them an officer of the defendant) were allowed to enforce a claim or to subscribe for the stock in question at the rate of the original offer, although the price of such subscription rights had risen or they were no longer obtainable. The directors, therefore, of the company could still use the surplus stock for the complainant's demands, and the stock of the new company is still available for exchange if he so desires. But the ability to obtain the property in some other way, or to find a measure of damage for the stock in question, does not show that an adequate remedy at law existed, nor prove that the complainant was bound to go out and buy other stock merely to save loss or trouble to the defendant, and before it was determined that his remedy should be an action for damages and not for the shares themselves.

The action was properly one in equity, to compel the defendant to perform its contract. To hold that a man has a complete and adequate remedy at law, because the particular property which he wishes has a money value, or because he might have gone into the market and purchased the property, and then claimed to have been damaged, is not a sufficient reason for refusing to exercise equitable jurisdiction, where the rights demanded are equitable rights, which might not have been substantiated in a court of law, and as to which the right to damages (if other stock had been purchased at an increased price) might not have been recoverable from the standpoint of legal (as distinguished from equitable) title. A court of equity should not go so far as to compel litigants, who seek property which they have a right to receive and can receive through the jurisdiction of the equity court, to keep out of the equity court and to proceed at law, where the possession of the property, or the right to the possession of the property, is the basis of the action, and where the legal title depends on conditions which have been met in equity alone.

The complainant therefore may have a decree for the relief prayed.