PUBLIC BANCORPORATION; complainant,

*v.*

ATLANTIC CITY WIMSETT THRIFT COMPANY et al., defendants.

[Decided February 5th, 1932.]

*Messrs. Cassman & Gottlieb,* for the complainant.

*Messrs. Endicott & Endicott,* for the defendants.

INGERSOLL, V. C.

The Atlantic City Wimsett Thrift Company is a corporation of this state, having been incorporated on or about February 17th, 1928, for the purpose, among other things, of engaging in a small loan business. Said company has a total authorized capital stock of one thousand five hundred shares of preferred stock of the par value of $100 per share, and five thousand shares of common stock of no par value.

Prior to April, 1931, the Public Bancorporation, the complainant, was the owner of two thousand shares of the common stock of said Atlantic City company, one thousand nine hundred and two shares having been sold principally to local people in Atlantic City, the remaining one thousand and ninety-eight shares of the original authorized capital stock remaining in the treasury unsold.

On April 27th, 1931, a demand was made on the Atlantic City company by a creditor, a local bank, demanding the payment of at least $6,000 on a note of $11,900 held by the bank. A special meeting of the board of directors was immediately called to consider ways and means of meeting the demands of the bank. The defendant company had not earned sufficient to pay the semi-annual installment of dividends upon the preferred stock. At that time there was owing to the preferred stockholders the sum of $9,800 and the company had on deposit, in cash, the approximate sum of $3,700.

This situation being presented to the board of directors, the president urged upon those present to take up the remaining unissued common stock of one thousand and ninety-eight shares, by each director taking a proportionate number thereof, at the rate of $5 per share, paying therefor in cash or by means of promissory notes, which could be discounted

in the banks, the proceeds of which could be used in satisfying the bank's demands.

The president further reported that E. E. Estoclet, A. H. Darnell, Dennis Kelly, W. F. Shaw, C. E. Adams, E. H. Harvey, E. R. Smith, Charles Proebstle, Chester Grey, Louis St. John, B. F. Dever, A. B. Endicott (Furniture Company), W. H. Norris and C. H. Godfrey had offered to purchase one thousand and ninety-eight shares of the common nonpar value stock of the company at the rate of $5 per share, and to pay for the same by check, or promissory note payable within four months.

After discussion, the following resolution was adopted:

"Be it resolved by the board of directors that whereas moneys are necessary to be raised to be applied in payment or reduction of certain promissory notes of the company now held by the Second National Bank, which notes amount to the sum of $11,900 and will mature on demand, that the offers made by E. E. Estoclet, A. H. Darnell, Dennis Kelly, W. F. Shaw, C. E. Adams, E. H. Harvey, E. R. Smith, Charles Proebstle, Chester Grey, Louis St. John, B. F. Dever, A. B. Endicott, W. H. Norris and C. H. Godfrey to purchase one thousand and ninety-eight shares of common no par value stock of the company remaining unissued, at the rate of $5 per share and to be paid by means of promissory notes executed by each of the offerees to the order of the company in the full amount of their respective purchase and payable within four months from the date of purchase be and the said offers hereby are accepted and the president and secretary are hereby authorized to issue certificates of common no par value stock to the offerees in accordance with the provisions of this resolution."

In accordance with said resolution, certificates for seventy-eight shares were issued to each of the following: William F. Shaw, Carleton E. Adams, Edmund R. Smith, Allen B. Endicott, Wendell H. Norris, Edwin H. Harvey, Bernard F. Dever and Chester Grey, and seventy-nine shares to Dennis Kelly, Louis St. John, Albert H. Darnell, Charles Godfrey and Emile Estoclet, and thirty-four shares to Joseph Proebstle and forty-five shares to Charles Proebstle.

The bill is filed alleging that the complainant "has been deprived of its valuable right to participate in said issue of one thousand and ninety-eight shares of common stock, to which it has always been ready and willing to subscribe its

proportionate share, and by reason of said deprivation, its control in the management has been destroyed and the value of its holdings materially diminished, the said issue of one thousand and ninety-eight shares of common stock being unlawful and fraudulent."

Section 124 of the General Corporation act, as amended, reads as follows:

"Upon the issue of capital stock for cash, unless otherwise expressly provided in the certificate of incorporation, or in by-laws adopted by two-thirds in interest of each class of stockholders, every stockholder shall have a right (unless waived by him) according to the number of shares held by him to purchase his *pro rata* proportion of the stock to be issued, at such price (which may be in excess of the par value), within such time and on such terms as shall be fixed and determined by the board of directors; provided, that unless otherwise expressly provided in the certificate of incorporation, or by-laws adopted by two-thirds in interest of each class of stockholders, a holder of preferred or special stock entitled to limited preferential dividends and to a fixed sum upon any distribution of the assets of the corporation shall have and be entitled to exercise such pre-emptive rights only in case of the issue of stock of the same class held by him or of any class which has preference or priority as to assets or dividends over the class of stock held by him. In any such case the board of directors shall have power to determine what disposition shall be made of any stock to be issued and which shall not be subscribed for by stockholders." *Cum. Supp. Comp. Stat. p. 293 § 124."*

Counsel for defendants insist that this statute, as well as the general rule of law, applies only to "new issues of stock" and does not refer to original unissued stock in the hands of the corporation, which, by an original act of the directors, is awaiting sale.

There appears to be no adjudication upon this point in this state, although Vice-Chancellor Grey, in *Way* v. *The American Grease Co., 60 N. J. Eq. 263,* says:

"The power of distributing a new issue does not lie at the mere choice of directors. It is not a perquisite which they may use for their private advantage. They may not overthrow or secure for themselves the control of the corporation by means of a new issue of stock. This is true, whether as to a part of the stock authorized by the original incorporation which remains untaken (*Reese* v. *Bank, 31 Pa. St. 78*), or as

to stock issued after incorporation, on a subsequently author-ized increase. *Gray* v. *Portland Bank, 3 Mass. 364.*"

The reason for this rule is given in *14 Corp. Jur. note 37 p. 394:*

"(1) The same rule applies, as we shall see (*infra* paragraph 525), in the case of an issue of an increase of the capital stock, and 'one reason on which the rule in either case rests, is that the stockholder has the right to preserve the proportionate interest in the corporation first acquired by him. To dispose of the unissued or added stock to strangers, or to other stockholders, without affording him an oppor-tunity to take his *pro rata* share, would be, without his consent, to impair his interest and influence in the corporation, and diminish the relative value of his holdings; and this the directors, who are trustees for the stockholders, may not lawfully do.' *Crosby* v. *Stratton, 17 Col. App. 212, 220; 68 Pac. Rep. 130.* To same effect, *Gray* v. *Port-land Bank, 3 Mass. 364; 3 Am. Dec. 156; Humboldt Driving Park Association* v. *Stevens, 34 Neb. 528; 52 N. W. Rep. 568; 33 Am. S. R. 654; Jones* v. *Concord, &c., R. Co., 67 N. H. 119; 38 Atl. Rep. 120; Meredith* v. *New Jersey Zinc, &c., Co., 55 N. J. Eq. 211; 37 Atl. Rep. 539; Reese* v. *Montgomery County Bank, 31 Pa. 78; 72 Am. Dec. 726.*

(2) This doctrine rests on the idea that, while its own corporate stock· is property, so that the sale and disposition thereof involve questions of business policy properly controllable by the directors' or stockholders' meeting, the original issue thereof involves something more; that the latter act goes to underlying organization—modifies the fundamental arrangement and proportions of the members. This doctrine is supported by overwhelming and almost unconflicting array of authority. *Luther* v. *C. J. Luther Co., 118 Wis. 112, 122; 94 N. W. Rep. 69; 99 Am. S. R. 977.*"

A note in *9 Am. & Eng. Ann. Cas. 746,* says:

"It seems that when a corporation decides to issue stock which it was authorized to but did not issue at the time of its organization, each shareholder is entitled to subscribe to his proportionate share of such stock. *Crosby* v. *Stratton, 17 Col. App. 212; 68 Pac. Rep. 130; Morris* v. *Stevens, 178 Pa. St. 563; 36 Atl. Rep. 151; Eidman* v. *Bowman, 58 Ill. 444; Reese* v. *Montgomery County Bank, 31 Pa. St. 78; Montgomery Bank* v. *Reese, 26 Pa. St. 143.* Compare *Curry* v. *Scott, 54 Pa. St. 270.* However, in the case of stock which has been once issued and subsequently reacquired by the corporation, the stockholders have no right to a preference over outsiders in subscrib-ing for the same. *Crosby* v. *Stratton, supra; Bonnet* v. *Eagle Pass First National Bank, 24 Tex. Civ. App. 613; 60 S. W. Rep. 325; State* v. *Smith, 48 Vt. 290.* 'The issued stock of a corporation repre-sents its paid-up capital. The holder owns it and disposes of it as

he sees fit; and if it finds its way back into the treasury of the corporation it becomes assets in the same sense that the corporation's other property is assets. It is still part of the paid-up capital; and its sale no more affects the value of the other stock, or the standing of the stockholders in the corporation, than the sale of the corporation's tools or machinery.' *Crosby* v. *Stratton, supra.*"

Still continuing said note—

"A stockholder may waive his right to a preference in the distribution of new stock. This waiver may be express or implied. Thus where a stockholder does not assert his privilege within a fixed time, or if no time is specified within a reasonable time, he will be deemed to have waived his right to a preference. *Crosby* v. *Stratton, supra; Eidman* v. *Bowman, supra; Real Estate Trust Co.* v. *Bird, 90 Md. 229; 44 Atl. Rep. 1048; Hammond* v. *Edison Illuminating Co., 131 Mich. 79; 90 N. W. Rep. 1040; Jones* v. *Morrison, 31 Minn. 140; 16 N. W. Rep. 854; Bonnet* v. *Eagle Pass First National Bank, supra.*"

Is the complainant in a position to enforce this principle? Three separate agreements were entered into between the Atlantic City Wimsett Thrift Company, the defendant, and the National Wimsett Company, as follows:

"(a) This memorandum of agreement dated at the city of Chicago, State of Illinois, as of the 7th day of June, 1928, between the National Wimsett Company, a Delaware corporation, hereinafter referred to as the National Company, and the Atlantic City Wimsett Thrift Company, a New Jersey Corporation, hereinafter referred to as the Atlantic City Company, witnesseth:

Whereas, the Atlantic City Company proposes to enter into the industrial or character loan business in the city of Atlantic City, New Jersey, and is desirous of acquiring an adequate and proper system for the conduct of such business, and

Whereas, the National Wimsett Company, under the terms and provisions of a certain contract in writing under date of May 27th, 1927, acquired from the Peoples Finance and Thrift Company of America, a Delaware corporation, a license to use 'Wimsett System,' and the right to license other persons, firms or corporations to use the same exclusively in restricted districts in certain cities in the United States, and in connection therewith to use the name 'Wimsett,' and all plans, designs, forms, working sheets and data used by the peoples Finance and Thrift Company of America in the establishment and operation of Wimsett loan companies such as have been used in approximately one hundred and thirty (130) such Wimsett loan companies in the United States, together with all improvements thereon and additions thereto, and

Whereas, the city of Atlantic City, New Jersey, is one of the cities selected by the National Wimsett Company for the establishment and operation of such a Wimsett loan company, and

Whereas, the Atlantic City Company desires to acquire from the National Wimsett Company the exclusive right to use said Wimsett system for Atlantic City, New Jersey, and

Whereas, the Atlantic City Company has been organized with provisions in its charter whereby the total number of shares that may be issued by the corporation is six thousand five hundred, of which one thousand five hundred shares of the par value of $100 per share amounting in the aggregate to $150,000 shall be seven per cent. preferred stock and five thousand common, which shares are without nominal or par value, and may be issued by the corporation from time to time for such consideration as may be fixed by the board of directors thereof, but which is intended to be sold at five dollars ($5) per share.

Now, therefore, in consideration of the mutual undertakings and agreements of the parties hereto, it is agreed as follows:

(1) The National Wimsett Company agrees to and hereby does grant to the Atlantic City Wimsett Company an exclusive and perpetual franchise for the city of Atlantic City, New Jersey, for the use of said Wimsett system, including all appurtenances thereto, as it is authorized so to do by and under the terms of the aforesaid contract of May 27th, 1927, with the Peoples Finance and Thrift Company of America, and in connection therewith, give the Atlantic City Company the advantage of counsel and advice, and provide statement or statement forms weekly or monthly reports.

(2) The Atlantic City Company agrees to accept, and does accept the exclusive franchise for the use of Wimsett system, together with all appurtenances, and agrees to use same exclusively in the operation of a Wimsett loan company in the city of Atlantic City, New Jersey, and in the conduct of its business it agrees to conform to said system, and in so doing from time to time to advise and consult with the National Wimsett Company or its duly authorized representative; that when it is ready to open for business it will pay to the National Wimsett Company the sum of five thousand dollars ($5,000), the same being consideration for services rendered and to be rendered, and the granting of franchise as herein granted. The Atlantic City Company agrees to have made an audit of its business by a firm of certified public accountants, to be agreed upon, quarterly, if considered practical and economical, but in no event less than immediately after the close of each fiscal year, and to furnish the National Wimsett Company a copy of any and all such audits; to systematically use the system of report forms furnished by the National Company, and to send them promptly to the National Company for consideration and advice by the National Company.

(3) The National Company will pay all the expenses of the incorporation of the Atlantic City Company. The National Company agrees to select a manager for the said business of the Atlantic City Company, subject to the approval of the board of directors of the Atlantic City Company; advise with the said board in the matter

of location for the business, selection and purchase of fixtures, the execution of a proper lease for the premises to be occupied, and all details necessary to the establishment of the business ready for operation; furnish all necessary forms to install the Wimsett system with which to conduct the business; furnish all necessary advisory service through a service man to be employed and paid by the National Company. This service man, in addition to teaching the employes of the Atlantic City Company the mechanics of the business under Wimsett system, will call upon business and professional men of Atlantic City to acquaint them with the advantages they may secure by availing themselves of the service of the Atlantic City Company; furnish copy of customary advertising program in connection with establishing a loan demand; complete a business structure for such Atlantic City Company with a view of obtaining subordinate or subsidiary capital at favorable rates.

The Atlantic City Company further agrees that the National Company shall be granted the right to have one representative on the board of the said Atlantic City Company.

(4) It is agreed that this memorandum of agreement includes within it the entire agreement between the parties hereto, and that no addition or modification hereof shall be binding upon either party hereto, unless such addition or modification be in writing signed by the parties hereto and attached hereto as a rider.

In witness whereof, the parties hereto have by their respective and duly authorized officers, hereunto set their corporate signatures and seals, all as of the day and year first above set forth.

(Signatures.) ''

"(b) This memorandum of agreement dated at the city of Chicago, State of Illinois, as of the 7th day of June, 1928, between the National Wimsett Securities Corporation, a Delaware corporation, hereinafter referred to as the Securities Corporation, and the Atlantic City Wimsett Thrift Company, a New Jersey Corporation, hereinafter referred to as the Atlantic City Company, witnesseth:

Whereas, the Atlantic City Company proposes to enter into the industrial or character loan business in the city of Atlantic City, New Jersey, and desires to sell its authorized capital stock for the purpose of providing the necessary capital with which to operate its business,. and

Whereas, the Securities Corporation is engaged in the business of selling the capital stock of corporations entering into the character or industrial loan business under the 'Wimsett system,' and has an organization created and in existence for that purpose, and

Whereas, the Atlantic City Company desires to secure the service of said Securities Corporation for the purpose above set forth.

Now therefore, in consideration of the mutual undertakings and agreement of the parties hereto, it is agreed as follows:

The Atlantic City Company hereby appoints the Securities Corporation as its sole and exclusive fiscal agent for the purpose of selling the capital stock of the Atlantic City Company, and the Securities Corporation hereby accepts such appointment and in connection therewith, agrees to put forth its utmost efforts to sell such

stock of the Atlantic City Company at as early a date as possible, making available the proceeds thereof for the use by the Atlantic City Company. The basis of such sale shall be as follows:

The Atlantic City Company has provided in its articles of incorporation for a capital issue of sixty-five hundred shares (6,500) of which fifteen hundred (1,500) shares are of a par value of one hundred dollars ($100) per share, amounting in the aggregate to one hundred fifty thousand dollars ($150,000) is preferred stock intended to be sold by the company at par, and five thousand (5,000) shares are common stock, which shares are without nominal or par value, and may be issued by the corporation from time to time for such consideration as may be fixed by the board of directors thereof, but which is intended to be sold at five dollars ($5) per share. It is understood that the Securities Company shall sell such preferred stock at one hundred dollars ($100) per share, and such common stock at five dollars ($5) per share, and that the Securities Corporation, as consideration for making such sales, shall receive from the Atlantic City Company a commission of fifteen per cent. (15%) of the sales price of such preferred stock sold, and no per cent. (%) of the sales price of such common stock sold, payment of such commission to be made the Securities Corporation by the Atlantic City Company as sales are made and delivered to the Atlantic City Company and in conformity to the laws and regulations of the State of New Jersey.

The Atlantic City Company further agrees that the National Wimsett Securities Corporation shall be granted the right to subscribe for twenty-five hundred (2,500) shares of the common stock of the Atlantic City Company, for which they shall pay five dollars ($5) per share.

It is understood and agreed that this memorandum of agreement includes within it the entire agreement between the parties hereto, and that no addition or modification thereof shall be binding upon either party hereto, unless such addition or modification be in writing signed by the parties hereto and attached as a rider.

In witness whereof, the parties hereto have by their respective and duly authorized officers, hereunto set their corporate signatures and seals, all as of the day and year first above set forth.

(Signatures.)"

"(c) Agreement made this            day of October, A. D. nineteen hundred and twenty-eight, between National Wimsett Securities Corporation, a corporation of the State of Delaware, hereinafter referred to as the 'Securities Corporation,' and the Atlantic City Wimsett Thrift Company, a corporaion of the State of New Jersey, hereinafter referred to as the 'Atlantic City Company,' witnesseth:

Whereas, heretofore, on the 7th day of June, 1928, the Securities Corporation and the Atlantic City Company entered into articles of agreement whereby the Atlantic City Company appointed the Securities Corporation as its sole and exclusive fiscal agent, for the purpose of selling the capital stock of the Atlantic City Company, and the Securities Corporation thereby accepted such appointment; and

Whereas, said agreement further provided that the Securities Cor-

poration was granted the right to subscribe for twenty-five hundred (2,500) shares of the common stock of the Atlantic City Company, for which they should pay five ($5) dollars per share; and · ·

Whereas, the parties hereto have agreed that before a general campaign for the sale of said stock shall be undertaken, that said articles of agreement shall be amended:

Now, therefore, be it known, in consideration of the premises, and the further sum of one ($1) dollar, each to the other in hand paid, the receipt whereof is hereby acknowledged, the parties hereto have, and by these presents, do agree as follows:

1. That the sole and exclusive fiscal agency by said agreement created is hereby ratified and approved, except that it is limited in point of time to the first day of May, A. D. 1929, at which time all rights of said Securities Corporation thereunder, to act as such sole and exclusive fiscal agent shall cease and determine, and all rights guaranteed under said agreement, of which this is an amendment, not theretofore earned, shall cease and end. Provided, however, that nothing herein contained shall deprive the Securities Corporation of the right to receive commissions earned for the sale of stock sold prior to the first day of May, 1929.

2. That the option granted unto Securities Corporation to subscribe for shares of the Atlantic City Company shall be limited to the right to subscribe to two thousand shares of the common stock of the Atlantic City Company, for which Atlantic City Company shall receive five ($5) dollars per share. Provided, however, that nothing herein contained shall deprive the said Securities Corporation of the right to subscribe to said two thousand shares of said common stock, provided said right is exercised within sixty (60) days after said Atlantic City Company shall open its office for business at Atlantic City, New Jersey.

In witness whereof, the parties hereto have by their respective and duly authorized officers, hereunto set their corporate signatures and seals all as of the day and year first above set forth.

(Signatures.) "

A general synopsis of these agreements shows a recital that the Atlantic City company was authorized by its charter to issue six thousand five hundred shares, of which one thousand five hundred shares were to be preferred stock and five thousand were to be common stock without par value, which might be issued by the Atlantic City company from time to time for such consideration as might be fixed by the board of directors, but which were intended to be sold at $5 per share, and an agreement that the national company should sell said stock and receive a commission of fifteen per cent. of the sales price of the preferred stock sold, but no commission on the sale of the common stock, and that the national company

should have an option to subscribe for two thousand shares of the common stock of the Atlantic City company; which apparently is the stock now held by said company.

In the minutes of the company appears the following:

"Mr. Charles S. Wholberg, representing the National Wimsett Company and the United Industrial Bancstocks Corporation, was then recognized by the chair. Mr. Wholberg stated that he was opposed to the issuing of surplus common stock as authorized in the minutes of February 17th, 1930 (which authorized that all surplus common stock, less a reserve of one share of common for each share of preferred unissued, be sold at $5 per share and that preferred stockholders be first offered surplus common stock at ratio of one-half share of common to one share of preferred or at proper ratio; that a letter be drafted and approved by attorney, offering above stock to preferred stockholders for limited period of ten days from date of letter, which motion was approved), on the ground that should remaining preferred stock of this company not be sold, the stock held by the National Company would be depreciated in value *pro rata*."

On April 29th, 1931, the date of the resolution authorizing the sale of this stock to the gentlemen named, the same two thousand shares of common stock originally issued to the National Wimsett company were registered upon the books of the Atlantic City Wimsett Thrift Company in the name of United Industrial Bancstocks Corporation, which was the successor to the National Wimsett company. Upon receipt of the two thousand shares duly transferred to the complainant, the secretary of the company registered said stock on said date in the name of said company.

In so far as the evidence is now before me, the said national company, by the above agreements, limited itself to a subscription of two thousand shares of the five thousand so authorized to be issued. This raises at least a doubt as to the rights of the complainant, and, as to doubt is to deny, the order to show cause, with the restraint, will be dismissed.

The resolution of the board of directors authorizing the issuance of this stock upon the delivery of promissory notes is, of course, invalid, as stock must be sold for either cash or for property purchase. However, I deem it unnecessary to comment further upon this, as there is no testimony before me that any of said stock remains unpaid for in cash.